IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SYLVIA A. FRIPP, | |
| Plaintiff, | CIVIL ACTION FILE NO. |
| v. | 1:21-cv-2670-CAP-JKL |
| CITY OF ATLANTA, GEORGIA, | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

In this case, Plaintiff Sylvia A. Fripp alleges that her former employer, Defendant City of Atlanta ("Defendant" or the "City"), unlawfully retaliated against her for complaining about workplace sexual harassment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). She also alleges that the City failed to pay her overtime in violation of the Fair Labor Standards Act (the "FLSA"). The City has moved for summary judgment as to both claims. [Doc. 65.] For the reasons that follow, it is **RECOMMENDED** that Defendant's motion be **GRANTED**.

## I.    BACKGROUND

### A.    Preliminary Matters

In evaluating Defendant's motion for summary judgment, the Court has considered the evidence of record as well as Defendant's Statement of Undisputed Material Facts ("DSUMF" [Doc. 65-2]), Plaintiff's Statement of Additional Material Facts ("PSAMF" [Doc. 71-3]), the responses thereto ("R-DSUMF" [Doc. 71-2] and "R-PSAMF" [Doc. 74-2]), and Defendant's reply in support of its statement of facts [Doc. 74-1].  Although both parties have lodged a smattering of objections to each other's statements, the Court need not address each and every objection in this report and recommendation.  Instead, the Court discusses objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.  The Court has also included some facts that the parties object to as immaterial to the extent that they provide context for the analysis that follows.

The Court has also conducted its own review of the materials submitted in support, including the depositions, exhibits, and declarations filed in this case, and includes facts drawn from its independent review of the record.  *See* Fed. R. Civ. P. 56(c)(3).  Where there is a conflict in the evidence, the Court accepts Plaintiff's evidence as true because she is the non-moving party.  *See Ruiz de Molina v. Merritt*

2

*& Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) ("If there is a conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor.").

### B.   Facts

In February 2013, Plaintiff began work in the City's sanitation department as an equipment operator.  (DSUMF ¶ 5; Dep. of Pl. [Doc. 66-1] at 91-92.)  In 2015, she was transferred to Defendant's Department of Transportation ("DOT"), where she worked as an Equipment Operator II in Defendant's North Avenue "bridge shop," which was responsible for helping maintain sidewalks, roads, and bridges.[1] (DSUMF ¶¶ 6, 8, 9; R-DSUMF ¶ 6; PSAMF ¶ 1.)  In that role, she worked both in an office setting and in the field, transporting trucks and assisting with asphalt and concrete.  (DSUMF ¶ 10.)  Allen Smith was her supervisor at all times relevant to this case.  (DSUMF ¶ 13.)

In November 2017, Plaintiff complained to Mr. Smith that a coworker had sexually harassed her in the bridge shop.  (Dep. of Allen Smith [Doc. 67-1] at 33.)

---

[1] The DOT handles maintenance of the City's roads, sidewalks, bridges, signals, and lane stripping, along with transportation planning and capital delivery such as resurfacing and redesigning roads.  (DSUMF ¶ 7.)

3

Mr. Smith investigated the complaint, but was unable to substantiate Plaintiff's claims. (DSUMF ¶ 18.[2]) Still, because Plaintiff felt that she had been the victim of harassment, Mr. Smith transferred her from the bridge shop to the so-called "administration building." (*Id.*; Allen Smith Dep. at 37.) According to Mr. Smith, the City "wanted to place [Plaintiff] in a different environment, just to give her space from anything she may have been perceiving as harassment or an uncomfortable situation." (Allen Smith Dep. at 37.) For the remainder of Plaintiff's tenure with the City, she mostly worked out of the administration building. (Pl. Dep. at 100-02; DSUMF ¶¶ 11, 17.) Plaintiff conceded that she "didn't have any problem with" working in the administrative building, which she explained "wasn't stressful." (DSUMF ¶¶ 20, 21.)

On April 10, 2018, Plaintiff filed a charge of discrimination with the EEOC (the "2018 Charge"). (DSUMF ¶ 15.) In it, she alleged that she had filed a sexual harassment complaint against a coworker in October 2015, again in 2017, and was then "transferred to the front office to perform odd jobs and subjected to a hostile

---

[2] In response to DSUMF ¶ 18, Plaintiff quibbles about the procedure used during Defendant's investigation into her harassment claim, but she does not refute that Defendant concluded that her complaint was unsubstantiated. (*See* R-DSUMF ¶ 18.) Because Plaintiff's response is argumentative and does not directly refute the substance of the statement, the statement is deemed admitted. *See* LR 56.1(B)(2)(a), NDGa.

4

environment when [she] was denied the ability to perform her job, denied pay for work performed, and denied promotion to a supervisor position." (DSUMF ¶ 15, 16.) Based on that charge and its underlying facts, Plaintiff filed a lawsuit against Defendant in this Court in January 2019, asserting claims for sex discrimination, hostile work environment, and retaliation in violation of Title VII. (DSUMF ¶ 22.) Plaintiff voluntarily dismissed that action on September 26, 2019. (DSUMF ¶ 23.)

For several years, Plaintiff had problems with her health, including issues associated with a workplace injury. The details of the injury and her treatment are not clear. Even so, it appears that in 2019, beginning around late summer and continuing into the fall of that year, Plaintiff was absent from work and was receiving worker's compensation benefits. (*See* Dep. of Maya Smith Ex. 12 [Doc. 70-13]; PSAMF ¶¶ 11-13.) In October 2019, her workers' compensation doctor, Michael York, M.D., released her to return to work on regular duty without any limitations. [Doc. 65-49 at 8 (return to work form).] Plaintiff did not return to work as expected, however. (Maya Smith Dep. Ex. 14 [70-15] (Nov. 27, 2019 letter to plaintiff).) On November 27, 2019, Nia Parker, the Human Resources Director for the City's Department of Public Works, wrote Plaintiff a letter warning her that if she did not return to work by December 3, 2019, her job would be deemed abandoned. (*Id.*; *see also* PSAMF ¶ 15.)

Plaintiff returned to work on December 3 as instructed.  (Pl. Dep. at 116.)

But even though she had been cleared to return with no restrictions, Plaintiff arrived

to work wearing a leg brace and using a cane.  (DSUMF ¶ 53.[3])  According to Maya

Smith, a Human Resources manager, because Plaintiff had been released to return

to work without restrictions by her doctor, but was still claiming that, due to a

personal injury, she could not perform the work as an equipment operator, her

department recommended that she attend a fitness-for-duty exam to determine if

she was capable of performing the duties of her position.  (DSUMF ¶ 54[4]; Dep. of

Maya Smith [Doc. 70-1] at 7-8, 32.)   A fitness-for-duty exam was therefore

scheduled for January 13, 2020.[5]  (*See* Maya Smith Dep. Ex. 37 [Doc. 70-38].)

Meanwhile, on January 2, 2020, Plaintiff filed an internal grievance with the

City, alleging that a coworker, Derek Ponder, sexually harassed her.  (DSUMF ¶

---

[3] In response to this statement, Plaintiff simply responded:   "Disputed. Plaintiff was in and out of treatment with Dr. York."  (R-DSUMF ¶ 53.)  Plaintiff did not, however, cite any evidence to support her objection to consideration of DSUMF ¶ 53, and her response does not directly rebut the statement.  As a result, the Court deems this statement admitted.  *See* LR 56.1(B)(2)(a)(2), NDGa.

[4] Plaintiff's response to this statement is argumentative, and the evidence she cites does not directly refute the substance of the statement.  (*See* R-DSUMF ¶ 54.) Accordingly, the Court deems the statement admitted.

[5] Neither party points to evidence that shows who ordered the fitness-for-duty exam, when the order was placed, or when Plaintiff was first informed that she would need to attend.

24; PSAMF ¶ 17.)  On January 6, 2020, Mr. (Allen) Smith emailed the grievance to Ms. Parker.  (PSAMF ¶ 18; Maya Smith Dep. at 20, Ex. 6 at 22-24 (email and grievance).)   That same day, Ms. Parker forwarded the grievance to James Merriweather, the Director of the City's Office of Labor and Employee Relations ("OLER"), and Ms. (Maya) Smith, writing that she would "like to discuss next steps if the claims are proven to be unfounded as this is one of numerous complaints made by this employee that have not been substantiated."  (PSAMF ¶ 19; Maya Smith Dep. Ex. 6 [Doc. 70-7] at 21; Dep. of Michael Derrick Kirkwood [Doc. 69-1] at 23.)  According to Ms. Smith, however, no plan was ever implemented to "stop" Plaintiff from complaining about sexual harassment or related issues. (Maya Smith Dep. at 18-19.)  On January 7, 2020, Schyuler Brown, an employee relations specialist in OLER, emailed Plaintiff that OLER had received her complaint and would contact her for additional information if necessary.  (DSUMF ¶ 25.)

On January 8, 2020, the City's Director of Enterprise Risk Management, Jerry DeLoach, emailed Ms. Smith and DeShonda Howard, who worked in risk management for the City and handled workers' compensation claims, to ask them to cancel the fitness-for-duty exam examination scheduled for January 13 because Plaintiff had just visited with Dr. York, who was expected to provide notes from

that visit.[6]  (Maya Smith Dep. Ex. 18 [Doc. 70-19] (Jan. 8, 2020 email thread).)

Ms. Smith confirmed receipt of Mr. DeLoach's email, and the fitness-for-duty

exam did not go forward at that time.  (Maya Smith Dep. Ex. 18 [Doc. 70-19], Ex.

37 [Doc. 70-38].)

Following Dr. York's January 8 examination, he opined that Plaintiff

remained at maximum medical improvement following previous work-related

injuries and that she could return to work without restrictions on January 9, 2020.

(Maya Smith Dep. Ex. 20 [Doc. 70-21] at 1.)  Dr. York noted, however, that

Plaintiff had knee problems that were not related to any workplace injury, and

recommended that she undergo left knee replacement surgery through her own

medical insurance.  (*Id.*)  Dr. York also noted that Plaintiff had brought in a

functional capacity evaluation that her attorney had ordered.[7]  (*Id.*)  Dr. York

---

[6] Mr. DeLoach noted that the fitness-for-duty exam could also be rescheduled if necessary after Dr. York's evaluation. (Maya Smith Dep. Ex. 20 [Doc. 70-19].)

[7] Curiously, the functional capacity evaluation stated that it had been prepared at Dr. York's request (*see* Maya Smith Dep. Ex. 22 [Doc. 70-23]); however,  it appears that Dr. York in fact did not order it (*see* Maya Smith Dep. Ex. 37 [Doc. 70-38] (stating that Dr. York did "not address[]" the functional capabilities evaluation because "he did not order it"); *see also id.*, Ex. 25 ("Dr. York has released her to regular duty.  He did not order the FCE therefore he should not be addressing the FCE.  We will have him [] clarify and make an addendum to the report[ed] work status.").

opined, under the heading "current work status," that Plaintiff "[m]ay return to light duty today based on the [functional capacity recommendations] today." (*Id.*)  The record is murky about what happened next, but it is undisputed that on January 28, 2020, Dr. York updated his opinion on Plaintiff's work status to indicate that she could return to work with no restrictions.[8]  (PSAMF ¶ 24.)

On February 4, 2020, Ms. Smith notified Plaintiff that she was required to report for a fitness-for-duty examination on February 6, 2020, and that she could complete a request for a disability accommodation (and submit it within ten business days).  (DSUMF ¶ 56; PSAMF ¶ 25.)  Plaintiff did not attend her fitness-for-duty exam or return any completed disability paperwork.  (DSUMF ¶¶ 57, 58; R-DSUMF ¶ 58.)

---

[8] According to Plaintiff, Connie Mabry, a third-party workers' compensation claims administrator, requested the change to Plaintiff's work status; however, it is unclear when or why that request was made.  Plaintiff writes that "On January 28, 2020, Connie Mabry contacted Dr. York and asked him to change the work status to return to work without restrictions."  (PSAMF ¶ 23.)  The email chain that Plaintiff cites to support this statement, however, does not say that Ms. Mabry contacted Dr. York that day to ask him to change Plaintiff's work status. (*See* Maya Smith Dep. Ex. 25 [Doc. 70-26].)  Rather, it appears that Ms. Mabry discussed the work status issue with Dr. York at some point in time.  It also bears mentioning that Ms. Mabry was not even a City employee; rather, she worked for PMA, the City's third-party administrator for workers' compensation claims.  (*See* Maya Smith Dep. at 33, 63.)

On March 25, 2020, Mr. (Allen) Smith sent Ms. (Maya) Smith a draft notice of proposed adverse action, in which he recommended Plaintiff's dismissal due to her failure to attend the fitness-for-duty exam.  (PSAMF ¶ 31.)  The termination did not proceed at that point, however, because Michael Kirkwood, who had succeeded Mr. Merriweather as the Director of OLER, discovered that Plaintiff's January 2, 2020 complaint about Mr. Ponder was still pending and needed to be resolved before the City could proceed with Plaintiff's dismissal.  (Kirkwood Dep. at 8, 23, 47-48.)

Mr. Kirkwood attempted, on multiple occasions, to schedule an interview with Plaintiff and her counsel, Keenon Peebles, in October 2020; however, Plaintiff and Mr. Peebles stopped communicating with Mr. Kirkwood, so no interview occurred.  (DSUMF ¶¶ 27, 29, 30, 31[9]; Pl. Dep. Ex. 15 [Doc. 66-15].)  Mr. Kirkwood ultimately determined that Plaintiff's allegations of sexual harassment were unsubstantiated (DSUMF ¶ 32), and on January 26, 2021, advised Plaintiff

---

[9] Plaintiff disputes DSUMF ¶ 31, asserting that "[t]he response is on Exhibit 14" to her deposition.  (R-DSUMF ¶ 31.)  There is, however, no Exhibit 14 to the Plaintiff's deposition.  [*See* Docs. 66-14, 66-15 (Pl. Dep. Exs. 13 and 15).]  As such, Plaintiff has not refuted the statement with evidence and the statement is deemed admitted.

and Mr. Peebles that the investigation had been closed.  (Pl. Dep. Ex. 15 [Doc. 66-15 at 5-6]).

On January 28, 2021, Plaintiff filed a charge of discrimination with the EEOC (the "2021 Charge"), alleging claims for sex discrimination and retaliation in violation of Title VII, based on Mr. Ponder's alleged harassment from September 2019 through July 5, 2020.  (DSUMF ¶ 33.)

Five days later, on February 2, 2021, Ms. (Maya) Smith wrote an email to Jennifer Hicks, the City's Director of Human Resources, stating, "The department would like to move forward with the termination of Sylvia Fripp.  We have been dealing with her for some time."  (PSAMF ¶ 36; Dep. of Jennifer Hicks [Doc. 68-1] at 5-6.)  There is no indication that Ms. Smith was aware that Plaintiff had filed the 2021 Charge.

In the meantime, Plaintiff was absent from work from December 2020 through March 2021.[10]  (DSUMF ¶ 60; R-DSUMF ¶ 60; PSAMF ¶ 37.)  City employees who anticipated being absent for an extended period of time must apply for leave under the Family Medical Leave Act ("FMLA") to protect their jobs. (Maya Smith Dep. at 65; Allen Smith Dep. at 67; Hicks Dep. at 23.)  As a result,

_____

[10] It appears that Plaintiff was sick with Covid-19 for at least part of this period.  (*See* Pl. Dep. at 56.)

on January 29, 2021, Myra Domineck, a Human Resources employee, emailed Plaintiff paperwork so that she (Plaintiff) could request leave under the FMLA. [Doc. 65-59 at 5.]  Relevantly, an employee who does not return FMLA documents is considered to be out on unapproved leave.  (Maya Smith Dep. at 51.)  So, while an employee can use accrued leave time in conjunction with FMLA leave, an employee's job will not be protected without approved FMLA leave.  (Allen Smith Dep. at 71, 85; Hicks Dep. at 23-24; Kirkwood Dep. at 53.)

On March 5, 2021, Mr. (Allen) Smith sent Plaintiff a memorandum, informing her that she had 323.80 hours of "FFCRA" leave (that is, leave under the Families First Coronavirus Response Act), 113.18 hours of sick leave, and 230.33 hours of paid time off available to use.  (Allen Smith Dep. Ex. 15 [Doc. 67-16].)  Mr. Smith instructed Plaintiff to advise him and Ms. (Maya) Smith by March 11, 2021, "regarding [her] recovery status and [her] plans and ability to return to work and which leave hours [she] would like to use." (*Id.*)  He also reminded Plaintiff that she would need to contact him to request an accommodation, if one was needed. (*Id.*)

On March 8, 2021, Plaintiff emailed Mr. Smith a physician's note stating that she should be placed on medical leave from January 14, 2021 through July 1, 2021.  (DSUMF ¶ 62; PSAMF ¶ 39.)  In the transmittal email, Plaintiff also

indicated she was "aware of FFCRA that expires March 31, 2021," and asked to use her "328 hours and after that my sick leave hours due to my underlying medical conditions." (R-DSUMF ¶ 62; PSAMF ¶ 38.)

On April 8, 2021, Mr. Smith emailed Plaintiff a "Notice of Proposed Adverse Action," advising that Plaintiff's employment be terminated effective April 22, 2021. (DSUMF ¶ 66; PSAMF ¶ 42; Pl. Dep. 15 [Doc. 66-16] (notice).) As grounds for the proposal, the notice read as follows:

> The department seeks to dismiss Sylvia Fripp, in part, because she was insubordinate, in violation of [Atlanta Code of Ordinance Section] 114-528(b)(3). Ms. Fripp was released to full duty from worker's comp on 11/1/2019 without any restrictions and scheduled to return to work on 11/4/2019; however, she elected to remain at home. Workers' Compensation (WC) Manager, DeShonda Howard informed HR and Transportation Manager, Allen Smith[,] that the city's WC Attorney, Todd Brooks requested Ms. Fripp remain on WC until 11/22/2019 after her appointment with a WC physician. The physician refused to see Ms. Fripp and agreed that she should return to work full duty without restrictions. Ms. Howard informed HR and management on 11/26/2021 [sic[11]] that Ms. Fripp was released to full duty by both WC doctors and that her office would send a 10-day notice to return to work. Ms. Fripp returned to work on 12/3/2019 wearing a leg brace and using a cane while claiming she was unable to perform the essential functions of her job as an Equipment Operator II. **She has refused to perform any functions in that capacity**. Because of her refusal and claim of inability to perform the essential

---

[11] A few dates appear to be incorrect; it appears that this reference to 2021 is a typographical error, and the date should instead be 2019.

functions, HR worked with the Benefits department to coordinate a Fitness for Duty Exam (FFD) with Caduceus USA that was scheduled for 1/13/2020.  Ms. Smith contacted Ms. Fripp on 1/8/2021 to inform her about the pending appointment and she stated she was currently at the doctor receiving a fitness for duty test through WC.  Ms. Smith was unaware of any test other than the one that was coordinated through the city's Benefits Department in conjunction with Caduceus.  Ms. Smith also shared with her that any test results from her personal doctor would not be used to determine her fit[ness] for duty; however, she could provide them as supporting documents during her appointment with the physician at Caduceus to assist him with his decision.  She stated that the doctor performing the test was Dr. York, the city's WC doctor.  During the conversation, Ms. Fripp told Ms. Smith to communicate the information pertaining to the scheduled FFD with her attorney.  As a result of the conversation, HR contacted Director of Enterprise and Risk Management, Jerry Deloach and Ms. Howard.  The FFD was cancelled at their request until they were received and were able to review the notes from Ms. Fripp's visit.  On 1/24/2020, Ms. Howard informed HR of the following, "Dr. York has concluded the current condition Ms. Fripp has is unrelated to work.  He confirmed that Ms. Fripp has a condition that will require a total knee replacement but again, it is non work related and should be covered under her personal health insurance.  The FCE (Functional Capabilities Exam) was not addressed.  The reason for this is, he did not order it; therefore, he will not acknowledge it."  It was determined that the FCE was ordered by Ms. Fripp's WC Attorney and not the city's WC doctors.  A second FFD was scheduled with Caduceus for 2/6/2020.  On 2/4/2020, HR Manager Maya Smith and Installation Chief Todd Miles met with Ms. Fripp to explain that the FCE was ordered because of her admitted inability to perform the essential functions of an Equipment Operator 11.  She was also provided with ADA accommodation request documents due to her personal injury.  The documents were due back to HR by 2/18/2020.  Ms. Fripp did not submit the ADA accommodation request documents.  She also violated 114-528(b)(16) as **she refused to attend the**

14

> **Fitness for Duty assessment as required and explained to her**.
> Ms. Fripp has been out of the office since 12/29/2021.  Human
> Resources sent FMLA documents to Ms. Fripp on January 29,
> 2021; however, the forms were not returned.   Regarding her
> absence, Allen Smith sent a recovery status memo to Ms. Fripp
> on March 5, 2021, inquiring about her return to work as well as
> informing her of her ability to request an ADA accommodation.
> Ms. Fripp responded to the memo's deadline on March 11, 2021,
> by providing a doctor's note stating she would be re-evaluated
> on 3/26/2021 and would need to remain out of work until
> 7/1/2021 without providing completed FMLA paperwork.  To
> date, **she has not requested a reasonable accommodation or
> returned any FMLA documents to support her inability to
> report to work and** is in violation of 114-528(b)(8) Absence
> without official leave.

(*Id*.)  The notice was signed by Mr. Smith as Plaintiff's supervisor, as well as by

Department Head Barrington Brown and Commissioner Josh Rowan.  (*Id.*)

On April 27, 2021, Defendant issued Plaintiff a Notice of Final Adverse

Action.  (DSUMF ¶ 67.)  According to the notice, Plaintiff was terminated for (1)

"failure to carry out an official directive or refusal to carry out the lawful,

reasonable directions given by a superior or other acts of insubordination" in

violation of City of Atlanta Code of Ordinances Section 114-528(b)(3); (2)

"absence without official leave" in violation of City of Atlanta Code of Ordinances

Section 114-528(b)(8); and (3) "the refusal, when so directed, to be examined by a

licensed physician designated by the City" in violation of City of Atlanta Code of

Ordinances Section 114-528(b)(16).  (Pl. Dep. Ex. 17 [Doc. 66-17] (final notice).)

15

Mr. Smith was the sole decisionmaker with respect to Plaintiff's termination. (DSUMF ¶ 69.[12])  He was not aware of Plaintiff's 2018 Charge, her 2019 lawsuit, or her 2021 Charge at the time he made the decision to terminate Plaintiff's employment.  (DSUMF ¶ 70.[13])

Additional facts are discussed in context below.

## C.    Procedural Posture

In her third amended complaint, Plaintiff asserts two claims:  one for unlawful retaliation under Title VII and the other for unpaid overtime under the FLSA.  [Doc. 43.]  On August 24, 2023, Defendant moved for summary judgment as to both claims.  [Doc. 65.]  Plaintiff filed a response in opposition to the motion. [Doc. 71.[14]]  Defendant has filed a reply.  [Doc. 74.]  The motion is now ripe for consideration.

---

[12] Plaintiff's response to this statement is argumentative and she does not directly refute the substance of the statement.  (*See* R-DSUMF ¶ 69.)  Thus, the Court deems the statement admitted.

[13] Plaintiff concedes that Mr. Smith was not aware of the 2021 Charge.  (R-DSUMF ¶ 70.)  She also baldly asserts that the credibility of Smith's testimony, in which he denied knowledge of Plaintiff's 2018 Charge or her 2019 lawsuit, is "questionable."  (*Id.*)  Since Plaintiff did not cite evidence to refute Mr. Smith's testimony—much less identify evidence that calls his credibility on this point into question—the Court deems Defendant's statement admitted.  *See* LR 56.1(B)(2)(a)(2), NDGa.

[14] Plaintiff's response brief violates the Local Rules because it is 35 pages long—well beyond the 25-page limit.  *See* LR 7.1(D), NDGa.  Plaintiff also

## II.   STANDARD OF REVIEW

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never

---

submitted exhibits to support her motion after the response deadline of September 14, 2023 passed.  [*See* Doc. 72 (exhibits docketed at 12:23 a.m. on September 15, 2023); Doc. 73 (Dep. of DeShonda Howard filed on September 20, 2023).] Defendant asks the Court to disregard the noncompliant portions of Plaintiff's brief and her untimely exhibits.  Though the Court does not condone Plaintiff's conduct, it will nevertheless consider the brief in full as well as the late-filed exhibits and deposition transcript.  That said, Plaintiff's counsel is warned that all future filings comply with the filing requirements, including the page limitations and deadlines set out in the applicable rules, and that failure to do so may result in sanctions, including the striking of noncompliant materials.

enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## III.   ANALYSIS

### A.   Plaintiff Has Abandoned Her FLSA Overtime Claim

The Court first takes up Plaintiff's FLSA overtime claim.  [*See* Doc. 43 ¶¶ 87-94.]  Defendant argues that it is entitled to summary judgment on that claim because Plaintiff conceded that she was properly paid for all overtime worked during the applicable limitations period and has "no evidence, whether documentation or testimony, as to the amount and extent of unpaid overtime work she allegedly performed or the timeframe for such unpaid overtime."  [Doc. 65-1 at 19-22[15].]  In response, Plaintiff has lodged no opposition or otherwise suggested that summary judgment would not be appropriate; indeed, the brief does not even mention the FLSA.  [*See* Doc. 71-1; *see also* DSUMF ¶¶ 45-47 (undisputed that Plaintiff was "properly paid for any overtime hours worked").]

Local Rule 7.1(B) provides that failure to file a response to a party's motion "shall indicate that there is no opposition to the motion."  LR 7.1(B), NDGa.  That rule "requires not just that a party generally 'respond' to a motion but mandates

---

[15] Defendant's summary judgment brief and reply each include a title page, table of contents, and table of authorities, and therefore, their page numbers do not align with the page numbers automatically applied to the document by the Court's CM/ECF filing system.  [*See* Docs. 65-1, 74.]  The undersigned will cite to the page numbers included by Defendant.

that a party respond to each portion of a motion." *Kramer v. Gwinnett Cnty*., 306 F. Supp. 2d 1219, 1221 (N.D. Ga.) (citing *Witter v. Delta Airlines, Inc*., 966 F. Supp. 1193, 1200 (N.D. Ga. 1997)), *aff'd*, 116 F. App'x 253 (11th Cir. 2004); *see also Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).   Because Plaintiff has completely failed to respond to Defendant's argument for summary judgment on her FLSA claim and has admitted she was paid for all overtime hours she worked, that claim "is deemed abandoned and need not be discussed any further." *See Pigford v. Flotel Inc*., No. 1:17-CV-01652-SCJ-RGV, 2018 WL 10741753, at *6 (N.D. Ga. Nov. 19, 2018) (finding that defendant was entitled to summary judgment where plaintiff did not respond to argument), *report and recommendation adopted,* 2018 WL 10741755 (N.D. Ga. Dec. 10, 2018).   Thus, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's FLSA claim.

20

B.     **Title VII Retaliation**

1.     **The Parties' Arguments**

The Court next takes up Plaintiff's Title VII retaliation claim.  Defendant contends that it is entitled to summary judgment for three main reasons under the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) burden-shifting framework. First, it argues that the sole employment action that could possibly support a retaliation claim is Plaintiff's termination from employment; thus, to the extent that her retaliation claim is based on any other action, it fails as a matter of law.  [Doc. 65-1 at 5-14.]  Second, it argues that Plaintiff cannot make out a prima facie retaliatory discharge claim because she has not presented evidence to establish a causal connection between any protected activity and her discharge.  [*Id.* at 14-16.] Third and finally, Defendant argues that even if she could make out a prima facie case, she cannot show that Defendant's legitimate, nonretaliatory reasons for firing her—namely, her refusal to attend a fitness-for-duty exam and her unexcused absences from work—are pretext for retaliation.  [*Id.* at 16-19.]

In her response, Plaintiff counters that the *McDonnell Douglas* framework is inapplicable because she has presented direct evidence that she was retaliated against for exercising her protected rights.  [Doc. 71-1 at 11-15.]  But even if her evidence is deemed merely circumstantial, she contends that she can still establish

a prima facie case of retaliation and that Defendant's reasons for firing her are pretextual.  Specifically, she asserts that she engaged in protected activity; that she suffered adverse employment actions—namely, the refusal to allow her to work a light duty job, interference with her workers' compensation claim, and the termination of her employment; and there is a direct causal connection between her sexual harassment complaints and her termination.  [*Id.* at 15-28.]  She additionally argues that Defendant has not met its burden to articulate a legitimate, nonretaliatory reason for terminating her employment, and that even if it had, its reasons are pretextual.  [*Id.* at 28-35.]  In Plaintiff's view, Mr. Allen Smith "wanted Plaintiff gone" because she complained about sexual harassment too much, so he and Ms. Maya Smith conspired to force Plaintiff to submit to a fitness-for-duty exam so "they could fire her with no consequences."  [*Id.* at 34-35.]

On reply, Defendant argues that none of the evidence in this case meets the strict definition "direct evidence" in Title VII cases, which is evidence that establishes the existence of retaliatory intent without the need for any inference or presumption.  [Doc. 74 at 2-4.]  Defendant also reiterates that the only possible adverse action in this case is Plaintiff's discharge and that Plaintiff cannot establish a causal connection between it and any protected activity because (1) she does not provide any evidence that the ultimate decisionmaker—Mr. Smith—was aware that

she had (recently) engaged in protected activity and (2) the gap between the protected activity and her termination is too long to establish an inference of causation on its own.  [*Id.* at 12-14.]  Finally, Defendant asserts that Plaintiff has failed to present evidence to show that its reasons for terminating her employment were pretext for retaliation.  [*Id.* at 14-17.]

The Court takes up these arguments below, beginning with Plaintiff's contention that she has presented direct evidence of retaliation.

### 2.    Direct Evidence

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  A plaintiff may establish a claim of unlawful retaliation by either direct or circumstantial evidence.  *Solomon v. Jacksonville Aviation Auth.*, 759 F. App'x 872, 874 (11th Cir. 2019).  "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption."  *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up).  It must evince both a retaliatory attitude and a correlation between that attitude and the purportedly retaliatory action complained of by the employee:  "[o]nly the most

blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (citing *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020)).  A quintessential example of direct evidence in a retaliation action is a statement like, "Fire [plaintiff]—he gave the most damning deposition testimony."  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997); *see also Dickey v. Dollar Gen. Corp.*, 351 F. App'x 389, 392 (11th Cir. 2009) (concluding alleged statement to plaintiff that she had been terminated, in part, because she had filed a claim with the Florida Commission on Human Relations to be direct evidence of retaliation under Florida's anti-discrimination law).  For a comment to be direct evidence, however, it must typically be made (1) by the decisionmaker responsible for the alleged discriminatory act, (2) in the context of the challenged decision, and (3) in temporal proximity to the employment decision.  *See Robertson v. Riverstone Cmtys., LLC*, 849 F. App'x 795, 801 (11th Cir. 2021); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002).

Plaintiff spends nearly three pages of her brief summarizing emails and other documents that she contends show direct evidence of retaliation.  [*See* Doc. 71-1 at 12-14.]  But even after all that, Plaintiff tacitly acknowledges that the evidence does

not meet the narrow definition of direct evidence under federal anti-discrimination law.  Specifically, she concludes her argument, writing that "[t]hese emails by Allen Smith and Nia Parker ***translate*** to 'Sylvia Fripp complains too much about sexual harassment, and we need to get rid of her.''  [Doc. 71-1 at 14 (emphasis added).]  The fact that Plaintiff must "translate" comments for them to show retaliatory animus is a tell-tale sign that they are not direct evidence, which would need no translation to understand.

And to drive this point home, the undersigned pauses to consider two statements identified by Plaintiff that come closest to suggesting retaliatory animus. First, in a February 2, 2021 email from Ms. Smith to Ms. Hicks, Ms. Smith wrote, "The department would like to move forward with the termination of Sylvia Fripp. We have been dealing with her for some time." [*Id.* at 14.]  A reader could conclude that this email shows retaliatory animus only by additionally ***inferring*** that Ms. Smith used the phrase "dealing with her for some time" to refer to Plaintiff's complaints of sexual harassment, and by ***subsequently inferring*** that department's desire to end her employment was in fact due to those complaints.  But neither of those points is made directly in the February 2 email, and the email therefore cannot stand as direct evidence of retaliation.

25

Next is Ms. Parker's email from January 2020, where, in response to Ms. Smith's email transmitting Plaintiff's complaint of harassment against Mr. Ponder, Ms. Parker wrote, "I would like to discuss next steps if the claims are proven to be unfounded as this is one of numerous complaints made by this employee that have not been substantiated."  [*Id.* at 13.]  This email also requires an inferential leap because the phrase "next steps" does not necessarily mean termination from employment, and there is nothing in the email to clarify.  Furthermore, Ms. Parker's stated concern is Plaintiff's continued lodging of complaints that have "not been substantiated," but does not directly opine about whether the then-current complaint raised legitimate concerns about sexual harassment.  And if all this were not enough, Plaintiff does not present evidence that Ms. Smith, Ms. Parker, or Ms. Hicks made the decision to terminate Plaintiff's employment.

At bottom, Plaintiff has not come forward with evidence that qualifies as direct evidence of retaliation.  The Court will therefore apply the *McDonnell Douglas* burden-shifting framework to evaluate her retaliation claim.

### 3.   *McDonnell Douglas* Framework for Analyzing Retaliation Claims Based on Circumstantial Evidence

When an employee relies on circumstantial evidence to demonstrate retaliation under Title VII, she must first establish a prima facie case of retaliation by showing that (1) she engaged in statutorily protected activity, (2) she suffered

26

an adverse employment action, and (3) there is some causal connection between the two events. *Yelling v. St. Vincent's Health Sys.*, __ F.4th __, 2023 WL 6474713, at *6 (11th Cir. Oct. 5, 2023) (citing *Little v. United Techs.*, 103 F.3d 956, 959 (11th Cir. 1997)). Only the second and third elements are at issue in this case. As to the second, a complained-of employment decision is actionable if it would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (quotation omitted).  This materiality threshold for retaliation claims is "decidedly more relaxed" than the standard for discrimination claims, which require "a *serious and material* change in the terms, conditions, or privileges of employment." *Crawford v. Carroll*, 529 F.3d 961, 970-71, 973 (11th Cir. 2008).  But even though Title VII's anti-retaliation provision prohibits a wider range of employer conduct than Title VII's anti-discrimination provision, "trivial harms" will still not constitute adverse employment actions even for retaliation purposes. *See id.* at 973 n.13.

As to the third element, a plaintiff satisfies the causal connection requirement by presenting evidence that her "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  "A plaintiff can establish causation for prima facie purposes by showing a 'very close' temporal proximity between the statutorily

27

protected activity and the adverse action." *Fitzgibbon v. Fulton Cnty., Ga.*, No. 20-11583, 2021 WL 79156 (11th Cir. Jan. 11, 2021) (unpublished) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).   But "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."  *Id.* (quoting *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006)).

After a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to produce legitimate reasons for the adverse employment actions. *Id*.  If the defendant offers legitimate reasons, the plaintiff must respond by showing that the employer's reasons are actually pretext for unlawful retaliation.  *Id.*

### 4.    Prima Facie Case

Defendant does not dispute that Plaintiff engaged in protected activity under Title VII [*see* Docs. 65-1, 74.]; however, the parties disagree about whether there were employment actions, other than Plaintiff's discharge, that were sufficiently adverse to support a Title VII retaliation claim and whether there is a causal link between Plaintiff's protected activity and any adverse actions, including her discharge.

### a.   Adverse Actions

In its motion for summary judgment, Defendant identified nine potential adverse employment actions that Plaintiff might assert as grounds for her retaliation claim.  [Doc. 65-1 at 6-14.]  In response, Plaintiff states that only (1) Defendant's refusal to allow her to perform light duty work, (2) its "interference" with her workers' compensation claim, and (3) her discharge qualify as adverse employment actions.  [Doc. 71-1 at 16-20.]  As a result, the Court deems abandoned Plaintiff's retaliation claim to the extent it is based on any other alleged adverse action, *see Resol. Tr. Corp.*, 43 F.3d at 599; *Wilkerson*, 270 F.3d at 1322, and limits its discussion to the three alleged adverse employment actions identified above.

In relation to Defendant's purported refusal to allow Plaintiff to perform light work, Defendant argues it is entitled to summary judgment because Plaintiff admitted that she could not recall Defendant ever denying a request for light duty work.  [Doc. 65-1 at 8-9; 74 at 6.]  In particular, Defendant cites to Plaintiff's deposition, where she testified, "I don't think I really asked for [an accommodation to light duty]" and "I can't recall . . . asking for one."  (Pl. Dep. at 138.)  Defendant also highlights that when Plaintiff was asked if there was ever a time that she requested light duty and was refused it, she responded, "I can't recall it."  (*Id.* at 141.)

29

Plaintiff does not rebut this evidence head-on.  Instead, she cites excerpts from emails produced in discovery in which Mr. Smith and others discuss Plaintiff's purported need for workplace accommodations over a near two-year period between January 2018 and January 2020, and whether there were jobs during that period that could accommodate the restrictions she purported to have at various times.  [Doc. 71-1 at 16-18.]  But none of those emails show that she *actually requested and was then denied* a light work assignment; quite to the contrary, they all acknowledge the restrictions she purported to have at various points, as well as the fact that there were no jobs available that could accommodate those restrictions. [16]   [*Id.*]   Separately, Plaintiff argues—without citing any evidence—that after she complained in January 2020 that Ponder had harassed her, she "was assigned no more light duty."  [Doc. 71-1 at 18.]  But this *ipse dixit* assertion—that she was not assigned light duty after January 2020—does not rebut her own admission that she had no recollection of ever asking for light duty work, nor does Plaintiff even point to evidence to suggest "light work" was even available outside of her temporary assignment to the administration building.  And in the

---

[16] Notably, Plaintiff does not raise any claims under the Americans with Disabilities Act or otherwise suggest she was denied a reasonable accommodation under that statute.

absence of any evidence from which a reasonable finder of fact could conclude that she requested and was denied available light duty work, she cannot show the purported denial of such work was an action that would have dissuaded a reasonable working from making a charge of discrimination.[17]

The same goes for Plaintiff's contention that Defendant interfered with her workers' compensation claim.   Plaintiff presents no evidence whatsoever that Defendant did anything to interfere with any workers' compensation benefit to which she was entitled.   As best the Court can tell, Plaintiff actually appears to be complaining about the time in January 2020, when Dr. York changed his opinion of Plaintiff's work status from light work to being able to return to work without restrictions.   [*See* Doc. 71-1 at 19.]   But Plaintiff does not even begin to explain how Dr. York's decision to revise her work status had any bearing on her worker's compensation claim, much less how Defendant's communications with Dr. York caused any changes to her worker's compensation benefits.   [*See id.*]   Further undermining Plaintiff's position, Dr. York's own treatment notes from his examination on January 8, 2020—that is, before any purported intervention by

---

[17] Nor can Plaintiff show a causal connection between protected activity and the supposed denial of light work.  Mr. Smith was aware that Plaintiff complained about Mr. Ponder in January 2020, but Plaintiff does not connect that knowledge to any instance where she was denied light work after that time.

Defendant—indicated that, in his opinion, Plaintiff could return to work without restrictions.  In contrast, his statement that she could return to light duty work was simply based on his interpretation of a functional capacity evaluation that Plaintiff brought to the examination with her.  Meanwhile, Dr. York's clarification of Plaintiff's return-to-work status in late January 2020 simply mirrored his original assessment of Plaintiff's functional abilities from earlier that month.  In the end, there is no basis for the Court to conclude that Defendant's communications did anything to harm Plaintiff in relation to her workers compensation claim, and therefore such actions would not have dissuaded an employee from exercising her rights under Title VII.[18]

### b.   Causal Connection

That leaves Plaintiff's discharge as the sole adverse employment action in this case.  Defendant argues that Plaintiff cannot establish a causal connection between it and any protected activity because there was a gap of three years

---

[18] As noted in the background section, Plaintiff asserts that Connie Mabry was the person who told Dr. York to change the work status.  Ms. Mabry worked for a third-party workers' compensation administrator—not Defendant—and there is no evidence whatsoever that she was aware that Plaintiff had engaged in activity protected by Title VII.  This means that even if Dr. York's change to Plaintiff's work status was somehow an averse employment action, Plaintiff cannot show a causal connection between that and any protected activity.

between the filing of her 2018 Charge and her termination; a two-year gap between the filing of her federal lawsuit in 2019 and her termination; a 15-month gap between her January 2020 grievance about Mr. Ponder and her termination; and a three-month gap between her 2021 Charge and her termination.  [Doc. 65-1 at 15.]  Defendant alternatively argues that there is "no evidence" that the decisionmaker, Mr. Allen Smith, "was aware of Plaintiff's purported protected activity at the time he made the decision to terminate her employment."  [*Id.* at 16.]

"To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'"  *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).  "[A] plaintiff may be able to rely solely on the temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality," so long as the proximity is "very close," usually less than two months.  *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 832 (11th Cir. 2013) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)); *see also Scott v. Sarasota Drs. Hosp., Inc.*, 688 F. App'x 878, 884 (11th Cir. 2017) (reaffirming that "[c]lose temporal proximity between an employee's protected

conduct and the adverse action is generally sufficient to create a genuine issue as to whether there is a causal connection"). In addition, "'unrebutted evidence that the decision maker did not have knowledge' of the employee's protected conduct means that 'temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection'" in such circumstances. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (quoting *Brungart v. BellSouth Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). "After all, a 'decision maker cannot have been motivated to retaliate by something unknown to him,' whether or not the two events happened close in time." *Id.* (quoting *Brungart*, 231 F.3d at 799).

In response to Defendant's arguments, Plaintiff writes "[t]he timeline of events clearly shows the cause of Plaintiff's termination," and then, over the span of nine pages, summarizes emails and other evidence from November 2017 through her discharge in April 2021. [Doc. 71-1 at 20-28.] But this argument about causation is completely undeveloped because it fails to explain—either directly or by implication—*how* any of the evidence Plaintiff cites demonstrates a causal connection between any particular protected activity and the termination of Plaintiff's employment. And worse yet, Plaintiff does not even attempt to rebut Defendant's argument that the temporal gap is too great to support a reasonable

34

inference of retaliatory intent or that Mr. Smith lacked knowledge of protected activity relevantly close in time to Plaintiff's discharge. "It is not the Court's obligation to construct legal argument for a party, especially when it is represented by counsel." *Examination Bd. of Prof'l Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, No. 17 C 6640, 2018 WL 1744673, at *2 (N.D. Ill. Apr. 11, 2018) (noting that plaintiff's "laundry list of facts" without corresponding legal analysis was too conclusory); *see also Resol. Tr. Corp.*, 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). As a result, the Court is left with Defendant's unrebutted arguments.

But even considering the evidence submitted, the Court concludes that no reasonable juror could conclude that there was sufficient causal connection between any protected activity and Plaintiff's discharge. As a threshold matter, the only protected activity at play here is Plaintiff's January 2020 internal grievance about Mr. Ponder, since it is undisputed that Mr. Smith—Plaintiff's supervisor and the decisionmaker with regard to her discharge—was unaware of Plaintiff's 2018 Charge, her 2019 employment discrimination lawsuit, or her 2021 Charge; and "[a] decision maker cannot have been motivated to retaliate by something unknown to

him."[19] *Brungart*, 231 F.3d at 799. Thus, the sole protected activity that could support a retaliation claim in this action is Plaintiff's January 2020 complaint of sexual harassment. Of course, well over a year passed between her complaint and the termination of her employment—far beyond two-month-or-less gap that the Eleventh Circuit has recognized as sufficient to establish causation. And, critically, this year-long gap was due to Mr. Kirkwood's view that Plaintiff's January 2020 harassment complaint needed to be resolved before Defendant could end her employment. Put differently, the evidence of record demonstrates that Plaintiff's January 2020 complaint of sexual harassment merely served to extend her employment, resulting in her receiving more favorable treatment than she would have otherwise received.[20]

---

[19] The Court pauses to note that Defendant's assertion that there is "no evidence that Allen Smith was aware of Plaintiff's purported protected activity at the time he made the decision to terminate her employment," [*see* Doc. 65-1 at 22], is demonstrably inaccurate in regard to at least one incident. Specifically, Mr. Smith emailed Plaintiff's written grievance to Ms. Parker on January 6, 2020; thus, he was certainly aware that Plaintiff had complained of sexual harassment involving Mr. Ponder in January 2020. (*See* PSAMF ¶ 18; Maya Smith Dep. at 20.)

[20] Though not argued by Plaintiff, even if the Court assumed that March 25, 2020—the date that Mr. Smith drafted a notice of proposed adverse action for Plaintiff's dismissal—was the date on which he finally decided that Plaintiff would be terminated, there is still no causal connection because that March 25 post-dates her complaint by well over two months, and, therefore, remains too remote in time to support an inference of retaliatory intent without more. *Williams v. Waste*

In the end, Plaintiff has not met her burden of demonstrating a causal connection between protected activity and her discharge from employment. Because she fails to establish a prima facie case of retaliation, Defendant is entitled to summary judgment.

### 5.    Legitimate Non-Retaliatory Reasons and Pretext

Even if Plaintiff could establish a prima facie case of retaliation, her claim would nevertheless still fail because she cannot show that Defendant's legitimate non-retaliatory reasons for terminating her employment were pretext for retaliation.

Defendant has explained that Plaintiff was fired (1) for insubordination, because she refused to submit to a fitness-for-duty examination, and (2) for prolonged absences, when she failed to report to work for months and refused to seek FMLA leave as instructed. [Doc. 65-1 at 16-18.] Plaintiff argues that neither of these reasons are legitimate—and thus do not pass muster under step two of the *McDonnell Douglas* analysis—because (1) neither Mr. (Allen) Smith nor Ms. (Maya) Smith had authority to direct Plaintiff to attend a fitness-for-duty examination; (2) the fitness-for-duty examination was unwarranted since she was

---

*Mgmt., Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011) (concluding that a "two-month gap may be 'closer' in time, but it is not 'very close'" as required to support a causal inference alone).

being seen by a workers' compensation doctor; and (3) the City's ordinances do not require employees to apply for FMLA when they anticipate extended leaves of absence.  [Doc. 71-1 at 28-34.]  But these arguments are better addressed at the pretext stage of the analysis.  Defendant's "exceedingly light" burden at this stage is one of production, not persuasion.  *See Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1297 (11th Cir. 2021).  Because insubordination and being absent from work are reasons that "might motivate a reasonable employer" to take action against an employee, *id.* (citation omitted), the Court finds that Defendant has met its burden at step two.

Moving on to the third stage of the *McDonnell Douglas* analysis, to show that an employer's given reasons are pretextual, a plaintiff must show "*both that the reason was false, and* that retaliation was the real reason."  *Tolar*, 997 F.3d at 1298 (quoting *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020)).  To make this showing, "a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Id.* (quoting *Gogel,* 967 F.3d at 1136).  The plaintiff must do more than just quarrel with the wisdom of the decision; "[t]o survive summary judgment, the plaintiff must . . . present concrete evidence in the form of

38

specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). At all times, the plaintiff retains the ultimate burden of persuading the finder of fact that the defendant acted with discriminatory intent. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In this case, while Defendant argues that there is no dispute that Plaintiff violated its workplace rules or that Defendant sincerely believed that the violations occurred, [Doc. 65-1 at 18-19], Plaintiff contends that the fitness-for-duty exam "only came up after Plaintiff had submitted her January 2, 2020 sexual harassment complaint," and that "[s]omeone obviously told Allen Smith or Maya Smith that they if could send Plaintiff to a Fitness for Duty Exam, then they could fire her with no consequences." [Doc. 71-1 at 34.] But this argument misses the mark. For starters, Plaintiff was fired (in part) because she refused to attend the examination, not based on the results of the exam; and Plaintiff's insinuation that Defendant manufactured the need for the exam as an excuse to discharge her is entirely speculative, as Plaintiff points to nothing in the record to support the notion. Indeed, the Court has found no evidence whatsoever to suggest that Plaintiff would have suffered any adverse consequences had she presented for the examination as

requested, much less that anyone surreptitiously recommended the exam as a way to discharge her.

Plaintiff's next contention, that she should never have been subject to a fitness-for-duty examination, fares no better. She notes that Atlanta Municipal Ordinance Section 114-380 provides that only "[t]he head of the department, with the approval of the commissioner of human resources," has the right to order physical examination of employees, *see* City of Atlanta Code of Ordinances Sections 114-380; [*see also* Doc. 71-1 at 30], and then underscores that no one obtained the approval of the head of Plaintiff's department or the commissioner of human resources before ordering the examination [*id.* at 30-31]. But here's the rub. Plaintiff's claim is not for a violation of the Atlanta Municipal Ordinance, and even if the Court assumed that Mr. Smith and Ms. Smith lacked specific authority to compel Plaintiff to attend an examination, Plaintiff comes forward with no evidence to suggest that they did not honestly believe they could require such an exam or discipline her for refusing one. And "[i]n and of itself, the mere fact that an employer was mistaken about the facts upon which the challenged employment decision was based does not establish pretext" for retaliatory motive. *Jones v. RS & H, Inc.*, 775 F. App'x 978, 988 (11th Cir. 2019). "Rather, 'a plaintiff must present evidence from which a reasonable jury could find that the defendant did

not honestly believe the facts upon which he allegedly based his non-discriminatory decision.'" *Id.* (quoting *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002)). In other words, the Court's "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010); *see also Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1313 (11th Cir. 2018) ("The question to be resolved is not the wisdom or accuracy of the employer's reasoning or whether the decision was prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivated the decision.") (cleaned up). Thus, even if Mr. Smith and Ms. Smith were mistaken about their authority to direct an employee to undergo a fitness-for-duty exam, Plaintiff does not establish pretext without some evidence tending to establish that retaliatory animus was the real reason.[21] Plaintiff's argument, however, fails to suggest that retaliatory motive played any role in the decision to require a fitness examination.

---

[21] About Plaintiff's argument that she should not have been required to attend a fitness-for-duty examination because she was under the care of a workers' compensation doctor, [*see* Doc. 71-1 at 31], Plaintiff still does not present evidence to suggest that Mr. Smith or Ms. Smith did not believe that they had the authority to direct her to complete a fitness-for-duty examination.

Plaintiff's final pretext argument—that Defendant used her absence from work as a pretext for retaliation—fares no better than the foregoing. Ms. Hicks, Defendant's Director of Human Resources, testified that employees who anticipated being absent for extended periods must apply for leave under the FMLA to protect their jobs. (*See* DSUMF ¶ 63.) Plaintiff attempts to rebut that testimony by pointing out that ordinances governing annual leave and sick leave do not themselves require an employee to submit an FMLA leave request. (*See* R-DSUMF ¶ 63.) But nothing Plaintiff points to in those ordinances precludes Defendant from implementing policies that nevertheless require employees to apply for FMLA leave when they are out of work for extended periods of time. And, more to the point, there is no evidence that anyone involved in the decision to terminate Defendant's employment did not honestly believe either that Plaintiff should have provided FMLA paperwork for her long-term absences or that she could be fired for refusing to do so.

As Ms. Smith and Ms. Hicks explained, if a City employee does not apply for FMLA leave and is out of work for an extended period, then that leave is unapproved, even if the employee has sick leave or other leave available. (Maya Smith Dep. at 51; Hicks Dep. at 24.) Defendant provided Plaintiff with FMLA paperwork (DSUMF ¶ 64); however, she never applied for FMLA leave or a

workplace accommodation (DSUMF ¶ 65)[22]; and she was absent from work for months, starting from the end of December 29, 2020 until her discharge in late April 2021. (Allen Smith Dep. at 61; *see also id.* Ex. 15 [Doc. 67-16] (noting Plaintiff's absence from work since December 29, 2020)).

For the foregoing reasons, even if Plaintiff could establish a prima facie case retaliatory discharge, she has failed to carry her burden to show by a preponderance of the evidence that Defendant's legitimate, non-retaliatory reasons for terminating her employment were a pretext for retaliation.  Thus, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's Title VII retaliation claim.

## IV.   CONCLUSION

For the reasons discussed above, it is **RECOMMENDED** that Defendant's motion for summary judgment [Doc. 65] be **GRANTED.**

---

[22] Plaintiff attempts to rebut Defendant's statement that she did not apply for FMLA leave or ask for an accommodation by referring to her March 8, 2021 email to Mr. Smith in which she stated that she wanted to use her "328 hours and after that my sick leave hours due to my underlying medical condition."  (R-DSUMF ¶ 65.)  This response, however, does not directly refute Defendant's statement.

As this is a final report and recommendation, there is nothing further in this action pending before the undersigned.  Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

IT IS SO RECOMMENDED this 23rd day of October, 2023.

_____
JOHN K. LARKINS III
United States Magistrate Judge